# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PHARMACEUTICAL HORIZONS, INC., | ) ) |
| Plaintiff, | ) |
| v. | ) No. 11 C 6010 |
| | ) Judge Blanche M. Manning |
| | ) |
| SXC HEALTH SOLUTIONS, INC. | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

The plaintiff, Pharmaceutical Horizons, Inc. ("PHI"), has sued SXC Health Solutions, Inc. ("SXC"), contending the SXC breached the parties' value-added reseller agreement. SXC counterclaimed alleging that PHI breached the contract and its duty of good faith and fair dealing, and seeking a declaratory judgment to that effect. PHI has moved for judgment on the pleadings with respect to both its and SXC's claims. For the reasons stated below, the motion is granted.

**Facts**

The facts of the case are undisputed. The parties entered into an Asset Purchase Agreement ("APA") on September 30, 2005, under which SXC purchased certain assets of PHI, including its "Rebate Program." The APA contained a provision under which PHI agreed not to compete with SXC in the business of providing rebate processing services for three years from the closing date of September 30, 2005. On the same day the APA was executed, the parties also signed a Value-Added Reseller Agreement ("VAR Agreement") under which PHI agreed to act as a value-added reseller of SXC's pharmaceutical rebate processing services. Specifically, the VAR Agreement appointed PHI as an "independent, nonexclusive, value-added reseller to

promote, distribute and sublicense [SXC's] Rebate Services." VAR, §1(a). Under the terms set forth by the parties, payment for the Rebate Services ordered by PHI and provided by SXC was to be "deducted by SXC from the rebate amounts received" with the balance to be remitted to PHI's customers with a written reconciliation. VAR §5(c). The VAR Agreement did not contain a non-compete or non-solicitation provision.

For several years after the execution of the APA and the VAR Agreement, PHI used SXC's pharmaceutical rebate processing services for its customers. However, on or around January 11, 2011, several of PHI's customers switched rebate processing services from SXC to one of its competitors. SXC sent a letter to PHI alleging breach of contract claiming that the VAR Agreement created an exclusive arrangement whereby PHI's customers were required to use SXC's rebate processing services. SXC threatened to (and ultimately did) withhold over $900,000 in rebate monies due PHI and its customers as damages for PHI's purported breach of contract. PHI then brought the instant suit alleging breach of contract by SXC for its failure to pay to PHI (and, ultimately, its customers) the over-$900,000 in rebate funds due under the VAR. SXC filed a counterclaim alleging breach of contract and breach of the duty of good faith and fair dealing, and seeking a declaratory judgment that PHI had breached the contract. PHI has moved for judgment on the pleadings with respect to its breach of contract claim as well as SXC's counterclaim.

The relevant contract provisions are as follows:

> Section 1(a)–under which PHI was appointed "as an independent, nonexclusive, value-added reseller to promote, distribute and sublicense the Rebate Services" to certain PHI customers.
>
> Section 1(c)–which provides that "PHI may not authorize any . . . value added resellers or other third parties to distribute the Rebate Services."

> Section 3(b)–which required PHI to "conduct business in a manner that reflects favorably at all times on the Rebate Services and the name, goodwill and reputation of SXC."
>
> Section 10–which provides how the VAR Agreement could be terminated.
>
> "Rebate Services"–defined as SXC's "services to process pharmaceutical rebates."

**Standard**

As noted by the Seventh Circuit, in the instance where a party is attempting to dispose of a case on the merits using Rule 12(c),

> the appropriate standard is that applicable to summary judgment, except that the court may consider only the contents of the pleadings. Thus, we take all well-pleaded allegations in the plaintiffs' pleadings to be true, and we view the facts and inferences to be drawn from those allegations in the light most favorable to the plaintiffs. We will not affirm the granting of the . . . 12(c) motion unless no genuine issues of material fact remain to be resolved and unless the [moving party] is entitled to judgment as a matter of law.

*Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993) (internal citations omitted).

**Analysis**

According to the plaintiffs, the disposition of the case depends on whether PHI was obligated to use SXC as its exclusive provider of rebate services under the terms of the VAR Agreement (PHI contends no). To establish a breach of contract under Illinois law, a plaintiff must prove: (1) that a valid and enforceable contract exists; (2) that it has substantially performed; (3) that the defendant has committed a breach; and (4) damages. *See Reger Dev., L.L.C. v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010).

The parties agree that a valid and enforceable contract exists. In addition, PHI contends that it substantially performed its obligations under the contract because no language in the VAR Agreement prohibits PHI from reselling, or PHI's customers from using, pharmaceutical rebate

processing services provided by another vendor.  SXC disagrees and alleges in its counterclaim that "[b]y entering into the VAR Agreement, PHI committed to using SXC to process pharmaceutical rebates for . . . PHI customers . . . ."  SXC's Counterclaim, ¶ 9, Dkt. #25.  It goes on to allege that when certain PHI steered customers to use another rebate processor, PHI breached the VAR Agreement.

"The primary goal of contract interpretation is to give effect to the intent of the parties" and "[i]n determining the intent of the parties, a court must consider the contract document as a whole and not focus on isolated portions of the document."  *Richard W. McCarthy Trust Dated September 2, 2004 v. Illinois Cas. Co.*, 946 N.E.2d 895, 903 (Ill. App. Ct. 2011) (citation omitted).  "If the language of a contract is clear and unambiguous, the intent of the parties must be determined solely from the language of the contract document itself, which should be given its plain and ordinary meaning, and the contract should be enforced as written."  *Id*.

Express Contract Language

The court can find no language in the contract that requires PHI to exclusively use the services of SXC.  SXC's arguments to the contrary are unavailing.  SXC first contends that PHI was required under § 1(a) of the contract not to steer its customers to a competitor of SXC and genuine issues of material fact exist about whether PHI breached that aspect of the contract which preclude judgment.  Section 1(a) states:

> SXC appoints PHI as an independent, nonexclusive, value-added reseller to promote, distribute and sublicense the Rebate Services:
> (i)    only to PHI's Customers; and
> (ii)   pursuant to mutually agreed upon terms and conditions to be completed no later than March 31, 2006.

Contrary to SXC's position, this section does not "require" PHI to do anything. In it, SXC merely appoints PHI as a "non-exclusive, value-added reseller to promote, distribute and sublicense the Rebate Services" but it does not state that PHI *must* act in that capacity. Indeed, as noted by PHI, the second whereas clause in the VAR Agreement states only that the parties agree that "PHI *may* serve as a value-added reseller," not that it was required to do so.

SXC next asserts that PHI did not substantially perform because it breached § 1(c) of the VAR Agreement which states that "[w]ithout the prior written approval of SXC, PHI may not authorize any dealers, agents, representatives, sub-distributors, value added resellers or other third parties to distribute the Rebate Services." According to SXC, if PHI steered customers to a different rebate service provider, "PHI breached its obligation to refrain from authorizing other third parties to distribute the services SXC was hired to perform for PHI and its customers." Response at 5, Dkt. #37. But SXC misinterprets the plain language of this section, which provides that as an appointed distributor of SXC's Rebate Services, PHI cannot then authorize others to distribute SXC's Rebate Services.[1] There is no allegation that PHI gave another party permission to use SXC's rebate processing services; rather, SXC alleges that PHI either appointed or allowed its customers to use *another company's* rebate processing services. In other words, PHI cannot authorize others to do what it has been appointed to do, which is

---

[1] The court finds PHI's analogy helpful. As stated by PHI,

> A lawnmower manufacturer could enter into a reseller (*i.e*., distribution) agreement with a retailer containing a similar provision that would prevent the retailer from authorizing another retailer from selling the manufacturer's lawnmowers. However, that provision would in no way prohibit the retailer from selling another manufacturer's lawnmowers to its customers.

Reply at 7, Dkt. #38.

promote, distribute, and sublicense SXC's Rebate Services. No such allegation is made and therefore, SXC's argument that PHI breached this section of the VAR Agreement is inapposite.

### Duty of Good Faith and Fair Dealing

In its third argument, SXC contends that by steering its customers to an SXC competitor, PHI breached its duty of good faith and fair dealing. Under Illinois law, a duty of good faith and fair dealing is implied in every contract. *See Reserve at Woodstock, LLC v. City of Woodstock*, 958 N.E.2d 1100, 1112–13 (Ill. App. Ct. 2011). "Its purpose is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract." *Gore v. Indiana Ins. Co.*, 876 N.E.2d 156, 161 (Ill. App. Ct. 2007). The duty requires "a party vested with contractual discretion to exercise it reasonably, and not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Seip v. Rogers Raw Materials Fund, L.P.*, 948 N.E.2d 628, 637 (Ill. App. Ct. 2011). However, the duty is "not an independent source of duties for the parties to a contract, and is 'used as a construction aid in determining the intent of the parties where an instrument is susceptible of two conflicting constructions.'" *Id.* (*quoting Fox v. Heimann*, 872 N.E.2d 126, 134 (Ill. App. Ct. 2007)). It cannot be used to create additional contractual terms. *See LaSalle Bank Nat'l Ass'n v. Moran Foods, Inc.*, 477 F. Supp. 2d 932, 938–39 (N.D. Ill. 2007).

As an initial matter, PHI contends that SXC cannot assert a separate claim for breach of the duty of good faith and fair dealing. SXC notes that it is not alleging an independent claim for breach of the duty of good faith and fair dealing; rather, it contends that PHI breached the VAR

Agreement by breaching the duty of good faith and fair dealing. Thus, this aspect of PHI's motion is denied.

According to SXC, § 1(a) of the Agreement "required" PHI to "promote, distribute, and sublicense" its Rebate Services to PHI's customers and because PHI failed to do so when it either steered its customers to another rebate processor or allowed its customers to use another processor, then it breached the covenant of good faith and fair dealing by not exercising its discretion reasonably and without improper motives. However, "Illinois law holds that parties to a contract are entitled to enforce the terms to the letter and an implied covenant of good faith cannot overrule or modify the express terms of the contract." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo,* 349 F.3d 376, 395-96 (7th Cir. 2003). As already discussed, the express terms of the contract do not "require" PHI to promote, distribute or sublicense SXC's rebate processing services. Because the contract did not impose a duty upon PHI to promote, distribute or sublicense SXC's Rebate Services, PHI cannot have breached the implicit covenant of good faith and fair dealing by failing to do so. *See, e.g.*, *Home Repair, Inc. v. Universal Restoration Services, Inc.*, 01 C 7141, 2002 WL 1263992 (N.D. Ill. Jun. 5, 2002) ("Particularly where the express terms of the Letter Agreement do not require Universal to seek consent from PWDS, Home Repair may not use the implied covenant of good faith and fair dealing to not only create a requirement that Universal request PWDS's consent, but also to amplify that obligation such that Universal's failure to do more than request PWDS's consent would constitute a breach.").

SXC's reliance on *Interim Health Care of Northern Illinois v. Interim Health Care*, 225, F.3d 876 (7th Cir. 2000), in an attempt to demonstrate a breach of the duty of good faith and fair dealing is unavailing. In *Interim*, the plaintiff, who operated a franchise of the defendant

medical services company, alleged that the defendant had violated its duty of good faith and fair dealing by encroaching on her territory, usurping her leads and terminating her franchise. The Seventh Circuit indicated that "[i]n order to properly evaluate this claim, we must examine further whether Interim-National was *obligated* to furnish national account leads to Interim-Evanston [the plaintiff]." *Id*. at 883 (emphasis added). In so doing, it examined the relevant contract language, which stated:

> Interim–National "agrees to ... [c]ooperate with Licensee in obtaining contracts for its services from government or industry ... [and f]urnish national account leads...."

*Id.* at 883. By this language, the national company affirmatively agreed (*i.e*., obligated itself) to do two things: cooperate with its licensees in obtaining contracts and furnish national account leads. Based on that obligation, the Seventh Circuit concluded that the contract provided the national company with discretion in referring national account leads and that a genuine issue of material fact existed regarding whether the national company "may have exercised its discretion to withhold national account leads with improper motive, thus indicating a breach of the covenant of good faith and fair dealing." *Id*. at 885. In contrast to the defendant in Interim-National, PHI did not obligate itself to promote or distribute SXC's Rebate Servcies in the VAR Agreement. Because no underlying contractual obligation existed, under Illinois law, the implicit duty of good faith and fair dealing cannot add that term.

<u>PHI's Interpretation</u>

SXC next contends that PHI's interpretation of the contract language would render it invalid and certain of its provisions meaningless. First, SXC asserts that PHI's interpretation, which gave PHI sole discretion to decide whether to promote SXC's services to its customers,

medical services company, alleged that the defendant had violated its duty of good faith and fair dealing by encroaching on her territory, usurping her leads and terminating her franchise. The Seventh Circuit indicated that "[i]n order to properly evaluate this claim, we must examine further whether Interim-National was *obligated* to furnish national account leads to Interim-Evanston [the plaintiff]." *Id*. at 883 (emphasis added). In so doing, it examined the relevant contract language, which stated:

> Interim–National "agrees to ... [c]ooperate with Licensee in obtaining contracts for its services from government or industry ... [and f]urnish national account leads...."

*Id.* at 883. By this language, the national company affirmatively agreed (*i.e*., obligated itself) to do two things: cooperate with its licensees in obtaining contracts and furnish national account leads. Based on that obligation, the Seventh Circuit concluded that the contract provided the national company with discretion in referring national account leads and that a genuine issue of material fact existed regarding whether the national company "may have exercised its discretion to withhold national account leads with improper motive, thus indicating a breach of the covenant of good faith and fair dealing." *Id*. at 885. In contrast to the defendant in Interim-National, PHI did not obligate itself to promote or distribute SXC's Rebate Servcies in the VAR Agreement. Because no underlying contractual obligation existed, under Illinois law, the implicit duty of good faith and fair dealing cannot add that term.

<u>PHI's Interpretation</u>

SXC next contends that PHI's interpretation of the contract language would render it invalid and certain of its provisions meaningless. First, SXC asserts that PHI's interpretation, which gave PHI sole discretion to decide whether to promote SXC's services to its customers,

would render the Agreement void for lack of mutuality. As noted by the Illinois Appellate Court,

> [i]n its most elemental sense, the doctrine of mutuality of obligation means that unless both parties to a contract are bound by its terms, neither is bound. [M]utuality of obligation in bilateral contracts is but another way of stating that consideration is essential. The parties to a contract do not have to have identical rights and obligations. The mutuality requirement is satisfied if each party has given sufficient consideration for the other's promise. Valuable consideration for a contract consists of some right, interest, profit or benefit accruing to one party . . . or undertaken by the other. If each party has given adequate consideration for the other's promise, the contract does not lack mutuality merely because its obligations appear unequal or because every obligation or right is not met by an equivalent counterobligation or right in the other party.

*Carter v. SSC Odin Operating Co., LLC,* 955 N.E.2d 1233, 1240-41 (Ill. App. Ct. 2011) (internal citations and quotation marks omitted). *See also Molton, Allen & Williams, LLC v. Continental Cas. Ins. Co.*, No. 09 C 6924, 2010 WL 780353, at *5 (N.D. Ill. Mar. 3, 2010) ("[u]nder Illinois law, . . . if the requirement of consideration has been met in the contract, mutuality of obligation pursuant to the arbitration provision is not required.").

SXC does not argue that the contract lacked consideration and indeed admitted in its answer to paragraph 30 of the complaint that "[t]he VAR Agreement between PHI and SXC is a binding written contract, reflecting a meeting of the minds of the parties thereto and appropriate consideration of the parties." Dkt. #25, ¶30. Thus, SXC's lack of mutuality of obligation argument fails.

SXC further asserts that PHI's interpretation would render certain other sections meaningless in contravention of the contract interpretation principle that the contract must be read as a whole and give meaning to all provisions. For instance, SXC contends that PHI's "obligations" under § 1(a), which "required" PHI to promote and distribute SXC's services

would be nullified. But the court has concluded that the express language of the contract in § 1(a) does not impose any obligation on PHI. SXC also asserts that § 1(c), which prohibits PHI from authorizing any third parties to distribute SXC's Rebate Services, would be nullified. But, again, this assertion is based on an incorrect reading of § 1(c), which, as already stated, simply precludes PHI from authorizing third parties to distribute SXC's rebate processing services, which it is not alleged to have done.

Nor is Exhibit A, which identifies the customers as to whom PHI was allowed (but not required) to act as a value-added reseller of SXC's services, made superfluous by PHI's interpretation. PHI was only allowed to offer SXC's Rebate Services to certain customers (those identified on Exhibit A), and whether it steered or allowed its customers to use another rebate processing service does not render Exhibit A superfluous. Presumably, had PHI offered SXC's services to a customer who was not on Exhibit A, it could be held liable for breach of contract.

Finally, SXC argues that § 10 of the VAR Agreement, which sets out the term and termination provisions, would be nullified since PHI's interpretation obviates the need for a termination provision. But this construction ignores not only the provisions of the Agreement which do establish obligations on behalf of both parties but also the fact that any contract, even one like this, which authorizes (but does not require) PHI to perform certain services, establishes a relationship between the parties which they might want or need to formally terminate. Accordingly, the court rejects SXC's argument that PHI's interpretation of the contract renders other provisions of the VAR Agreement meaningless or superfluous.

<u>Extrinsic Evidence</u>

In another argument, SXC maintains without citation to authority that because it has set forth a reasonable interpretation of the Agreement, the court should deny PHI's motion for judgment on the pleadings and allow SXC to submit extrinsic evidence in support of its interpretation. But, in interpreting a contract, "[t]he [c]ourt looks first to the contract's language-and only to that language," and "[i]f that language is free of ambiguity, the [c]ourt interprets the contract's terms with reference to their plain meanings (unless otherwise defined) and does not draw on extrinsic evidence." *Wehrenberg v. Federal Signal Corp.*, 06 C 487, 2008 WL 4874150, at *1 (N.D. Ill. Jun. 13, 2008). Here, the court has interpreted the plain language of the contract and found it to be unambiguous. Thus, the court need not resort to extrinsic evidence.

**Conclusion**

For the reasons stated above, PHI's motion for judgment on the pleadings [35-1] is granted. The parties are directed to submit no later than June 4, 2012, a joint statement indicating how they wish to proceed with respect to establishing damages and raising any other issues they wish to bring to the court's attention.

**ENTER**: May 15, 2012

_____
**Blanche M. Manning**
**United States District Judge**